| | |
|---|---|
| 1 | RICHARD S.J. HUNG (CA SBN 197425) |
| | rhung@mofo.com |
| 2 | JOHN S. DOUGLASS (CA SBN 322801) |
| | jdouglass@mofo.com |
| 3 | MORRISON & FOERSTER LLP |
| | 425 Market Street |
| 4 | San Francisco, California 94105-2482 |
| | Telephone:   (415) 268-7000 |
| 5 | Facsimile:    (415) 268-7522 |
| 6 | MARY PRENDERGAST (CA SBN 272737) |
| | mprendergast@mofo.com |
| 7 | MORRISON & FOERSTER LLP |
| | 2100 L Street, NW, Suite 900 |
| 8 | Washington, District of Columbia 20037 |
| | Telephone:   (202) 887-1500 |
| 9 | Facsimile:    (202) 887-0763 |
| 10 | Attorneys for Plaintiff |
| | APPLE INC. |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APPLE INC., | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | **(1) MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C § 1836** |
| MICHAEL RAMACCIOTTI and JON PROSSER, | |
| Defendants. | **(2) VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030** |

Plaintiff Apple Inc. ("Plaintiff" or "Apple"), by and through its undersigned counsel, files this Complaint against Defendants Michael Ramacciotti and Jon Prosser (collectively "Defendants") and alleges as follows:

## INTRODUCTION

1. This case arises from Defendants' coordinated scheme to break into an Apple development iPhone, steal Apple's trade secrets, and profit from the theft. Defendants' acts harmed Apple and its thousands of employees working tirelessly on iOS and iPad OS, who spend years working in secret on Apple's new features and products.

2. Apple is a world-renowned technology company and global leader in consumer electronics, mobile communications, and computing. With over 90,000 employees in the U.S. alone, Apple invests billions of dollars on research and development each year. The results of Apple's creative labors include Mac, iPhone, iPad, AirPods, Apple Watch, and Apple Vision Pro, as well as iOS and other software that powers and animates those devices.

3. Apple takes great care to protect the secrecy of its unreleased products and features. All employees are trained on protecting trade secrets and bound by confidentiality agreements. Among other things, Apple also restricts access to buildings, devices, and files based on each employee's assigned responsibilities. But these safeguards can only go so far to protect against bad actors determined to steal Apple trade secrets.

4. The Defendants here conspired to break into an Apple employee's development iPhone to take Apple's trade secrets. On April 4, 2025, Apple received an anonymous tip email about potential unauthorized disclosures of Apple confidential information:

> **From:** ▉▉▉▉
> **Subject:** iOS 19 Leaker Information - Ethan Lipnik
> **Date:** April 4, 2025 at 2:59 PM
> **To:** ▉▉▉▉
>
> I am not sure who to contact, but as a courtesy to the iOS 19 team at Apple, I wanted to share information that I have about an employee who leaked pre-release design details.
>
> The iOS 19 information shared by Jon Prosser is sourced from Ethan Lipnik.
>
> https://www.youtube.com/watch?v=HaP_q9W3AQE
> https://www.youtube.com/watch?v=2RKrbTkP53M
>
> There was a FaceTime call between Prosser and Lipnik or a friend of Lipnik's where the iOS 19 interface was demonstrated to Prosser. Prosser has details on the Lock Screen, Home Screen, app animations, and app interfaces. The call was a few months ago. Prosser has video from it that shows the iOS 19 interface.
>
> Michael Ramaciotti, ▉▉▉▉, ▉▉▉▉, and ▉▉▉▉ are involved. Prosser also has been sharing clips from the recorded FaceTime call with Apple leakers.
>
> I am sure that Apple has the resources to further investigate. ▉▉▉▉ has leaked iOS information to ▉▉▉▉ and others in the past.

5.  Apple's subsequent investigation revealed that Defendant Jon Prosser—working with Defendant Michael Ramacciotti—improperly accessed and disclosed Apple's highly confidential, unreleased software designs, including details regarding the unreleased iOS 19 operating system (which is now known as iOS 26) for Apple mobile devices.

6.  Both Defendants knew that Apple goes to great lengths to protect its trade secret information, including the highly sensitive information contained on devices used for the express purpose of developing new products. Defendants also explicitly acknowledged they were not authorized to access those devices, much less steal Apple's trade secrets from them.

7.  Defendants' misconduct was brazen and egregious. After Mr. Prosser learned that Mr. Ramacciotti needed money, and that his friend Ethan Lipnik worked at Apple on unreleased software designs, Defendants jointly planned to access Apple's confidential and trade secret information through Mr. Lipnik's Apple-owned development iPhone (the "Development iPhone"). Apple learned the details of the scheme in Mr. Ramacciotti's own words—through an audio message to Mr. Lipnik, which Mr. Lipnik provided to Apple.

8.  According to Mr. Ramacciotti's message, while staying at Mr. Lipnik's home, Mr.

Ramacciotti used location tracking to determine when Mr. Lipnik would be gone for an extended period, acquired his passcode, and broke into his Development iPhone, which Mr. Lipnik had failed to properly secure according to Apple's policies. As he detailed in the audio message, Mr. Ramacciotti made a video call to Mr. Prosser and "showed iOS" on the Development iPhone. He demonstrated several features and applications, disclosing details of the unreleased iOS 19 operating system.

9. Mr. Ramacciotti admitted he knew this access and copying was unauthorized and could put Mr. Lipnik's career in jeopardy, but he did it anyway. Apple subsequently ended Mr. Lipnik's employment for failing to follow Apple's policies designed to protect its confidential information, including development devices and unreleased software and features.

10. According to Mr. Ramacciotti, Mr. Prosser proposed the scheme and promised to "find out a way for [Mr. Ramacciotti] to get payment" if Mr. Ramacciotti would provide access to Mr. Lipnik's Development iPhone so Mr. Prosser could steal and profit from Apple's confidential information. Mr. Ramacciotti acknowledged that Mr. Prosser recorded the video call with screen capture tools. Mr. Prosser took videos of the trade secrets on the Development iPhone, kept them on his own device, and disseminated those recordings to others. He shared the recordings with at least one person who reported back to Mr. Lipnik that he recognized Mr. Lipnik's apartment in the recording. Ultimately, Mr. Prosser profited off Apple's trade secrets by, at least, sharing them in multiple videos on his business's YouTube channel, from which he generates ad revenue.

11. Defendants' unlawful acts, which constitute knowing and intentional trade secret misappropriation, have damaged Apple with respect to its competitors, including by giving them the advantage of knowing more about Apple's software designs and unreleased functionality in advance of their release. Moreover, Apple does not know the full extent of its trade secrets and confidential information that Defendants viewed or retained when they accessed Mr. Lipnik's Development iPhone, which contained a significant amount of additional Apple trade secret information that has not yet been publicly disclosed. In view of the audacity of their acquisition and disclosure of its trade secrets, Apple fears that Defendants will continue to misuse its trade secrets absent judicial intervention.

12. Apple therefore brings this lawsuit to protect its trade secrets, to prevent Messrs. Ramacciotti and Prosser from continuing to act unlawfully, and for damages arising from their misconduct.

## JURISDICTION, VENUE, AND PARTIES

13. This Court has original jurisdiction over Apple's federal law claims under the Defend Trade Secrets Act (18 U.S.C. § 1831, et seq. ("DTSA")) and the Computer Fraud and Abuse Act (18 U.S.C. § 1030 ("CFAA")) and federal question jurisdiction under 28 U.S.C. § 1331.

14. Venue is proper under 28 U.S.C. § 1391(b), (c) because a substantial part of the events or omissions giving rise to Apple's claims occurred in this judicial district.

15. Apple is a California corporation having its principal place of business at One Apple Park Way, Cupertino, California 95014.

16. Mr. Ramacciotti is a product analyst and video editor at NTFTW. Upon information and belief, he resides in Pioneer, California and is subject to both general and specific jurisdiction in California. Upon information and belief, Mr. Ramacciotti's unauthorized access of the Development iPhone took place at Mr. Lipnik's apartment in Santa Clara, California.

17. Mr. Prosser has hosted the YouTube channel "Front Page Tech" since 2013. Upon information and belief, he resides in Derrick City, Pennsylvania. This Court has specific jurisdiction over Mr. Prosser in this forum because he conspired with a California resident and deliberately reached out to California to improperly access, view, and acquire Apple's confidential information. Without authorization, he accessed and copied from a Development iPhone located at Mr. Lipnik's apartment in Santa Clara, California. His actions were intentional, were expressly aimed at California, and caused harm that he knew Apple would likely suffer in California.

## BACKGROUND

**A.     Apple's Proprietary Software Designs**

18. Apple's competitive success depends heavily on its ability to continually develop innovative services and technologies. Apple spends billions of dollars annually to create new

COMPLAINT
CASE NO.                                                                                    4

technologies, upgrade existing products and services, and expand the range of its offerings. Over the past two decades alone, Apple has spent hundreds of millions of dollars on the design and improvement of the user interfaces and native applications for its iOS products.

19. Apple conducts its research and development activities under strict conditions to maintain the secrecy of its unreleased offerings. Apple restricts internal access to information about its unreleased products on a need-to-know basis. Apple employees also expend considerable time and energy to ensure that unreleased product details remain secret until Apple releases the product or Apple elects to make related official statements.

20. Apple makes considerable investments in advertising and promoting the launch of its new and upgraded products and software. By maintaining the confidentiality of its unreleased software, including forthcoming iterations of its mobile and Mac operating systems, Apple protects itself from competitive harm and ensures that a new product or feature announcement will generate consumer interest and sales.

21. The unauthorized access to and disclosure of information about Apple's unreleased products and software harms Apple in multiple ways. It undermines the considerable time and billions of dollars that Apple invests in carefully researching, developing, and releasing its products. And it can impair sales of a current model by causing consumers to await the release of newer models.

22. The unauthorized disclosure of Apple's trade secrets regarding unreleased product features places Apple at a competitive disadvantage. When a competitor learns of Apple's proprietary software designs before their release, the competitor may redirect its product development and marketing efforts to frustrate Apple's own plans. The competitor also may accelerate its development of similar features or products.

**B.   Apple Diligently Protects the Secrecy of Its Proprietary and Trade Secret Information**

23. Apple diligently protects its proprietary and trade secret information. Apple provides equipment, networks, and electronic systems (such as internet and intranet access, voicemail, email, instant messaging, and collaboration tools) to its employees to conduct its

COMPLAINT
CASE NO.                                                                                                5

business. Access to these is subject to strict security protocols and policies, including: the use of passwords, multi-factor authentication, and encryption to protect data on its computers, servers, and repositories; written policies and procedures emphasizing employees' duties to maintain the secrecy of Apple's confidential information; and confidentiality and non-disclosure agreements requiring employees, vendors, customers, partners, and contractors to do the same. People outside of Apple cannot access Apple's computers without authorization.

24. Apple also protects its physical facilities with locks, security cameras, and security guards. To gain access to Apple facilities, individuals must have Apple-issued keycards. Only Apple employees, temporary employees, eligible vendors, associates, and contractors receive keycards. Individuals lacking a keycard must be escorted by an Apple employee while inside Apple's facilities.

25. As a condition of their employment, Apple employees also must sign a confidentiality agreement obligating them to protect, during and after their employment, Apple and third-party confidential information that they acquire during their employment. Apple ensures its employees understand their obligations by providing regular training.

26. Apple also provides its employees with rules and guidelines on how to preserve the confidentiality of Apple's proprietary information. These materials forbid employees from distributing Apple confidential information to others except on a need-to-know basis.

27. Apple also protects the secrecy of details related to its unreleased offerings by limiting employee access to project-related information only to those people who are "disclosed" on a project, i.e., determined to have a "need to know" project-specific proprietary information. Software engineers, for example, may require login credentials to access specific source code repositories, with access further restricted to their particular job responsibilities. Apple also limits issuance of development devices to only those employees who must have access to perform their jobs, and provides separate guidance on how to maintain the devices in a secure manner, including never leaving the devices unattended.

### C. Defendants Conspired to Unlawfully Access and Acquire Apple Proprietary and Trade Secret Information Without Authorization

28. Messrs. Ramacciotti and Prosser schemed, agreed upon, and carried out, a plan to acquire confidential information about Apple's unreleased software designs by improperly accessing Mr. Lipnik's Apple-owned Development iPhone without Apple's authorization.

29. Because Mr. Prosser lacked access to Apple's networks and systems, he enlisted Mr. Ramacciotti to help him access Apple's confidential software designs. Mr. Prosser promised Mr. Ramacciotti compensation in the form of money or a future job opportunity for Mr. Ramacciotti in exchange for helping Mr. Prosser to access, obtain, and copy Apple confidential information.

30. Mr. Ramacciotti was friends with Mr. Lipnik, an Apple software engineering employee to whom Apple had issued the Development iPhone to develop and test certain aspects of Apple's unreleased operating systems. According to Mr. Lipnik, Mr. Ramacciotti often spent time at his home, sometimes staying for the weekend, and observing his patterns and security protocols for his devices.

31. At Mr. Prosser's direction, Mr. Ramacciotti obtained Mr. Lipnik's passcode, unlocked the Development iPhone, and shared details about iOS 19 with Mr. Prosser via FaceTime. According to Mr. Ramacciotti, he accessed confidential information on the Development iPhone while in Mr. Lipnik's apartment. Once he was sure he was alone in Mr. Lipnik's home, Mr. Ramacciotti used location tracking to determine when Mr. Lipnik would return so that he would know how much time he had to break into the device and copy Apple's trade secrets. When he confirmed Mr. Lipnik was gone, Mr. Ramacciotti made a FaceTime call to Mr. Prosser. According to forensic evidence, Mr. Ramacciotti called Mr. Prosser *before* he unlocked the Development iPhone, indicating that Mr. Prosser was involved in the decision to improperly access Apple's trade secrets. Mr. Ramacciotti then entered the stolen passcode, accessed, and disclosed iOS19 to Mr. Prosser. As he did so, Mr. Prosser screen captured the FaceTime call—copying Apple's confidential trade secrets—and shared the recording and renderings of Apple's unreleased software designs with others.

32. Defendants knew that information about the unreleased software was highly confidential and accessible only via Apple's protected systems. Mr. Prosser has publicly boasted about securing access to Apple's confidential software designs despite the protections Apple has put in place to keep the information confidential: "Apple does a lot of clever hiding. Let's say you're an Apple engineer: some elements of the OS are forked off into separate teams to prevent a full build from being in your possession, which is also why we never really see iOS leak early. Some of the elements are especially hidden—not from you, but maybe from prying eyes while it is in your possession." fpt., *This Video is the Biggest iOS Leak Ever | iOS 19 Early Preview*, https://www.youtube.com/watch?v=YGI8sZqWEl0 at 2:17-2:43; fpt., *Introducing iOS 19 | Exclusive First Look*, https://www.youtube.com/watch?v=2RKrbTkP53M at 1:19-1:33 ("We were shown the real deal, and the real deal is littered with identifiers to help Apple find leakers. So instead of risking anyone's jobs or lives, we've recreated what we saw."). Mr. Prosser advertises his ability to get Apple confidential information via unauthorized methods to benefit his own business. Mr. Prosser has demonstrated the confidential information is valuable to him, as he has offered Mr. Ramacciotti financial compensation in return for such information. Mr. Ramacciotti, in turn, has acknowledged the confidentiality of the information—for example, by apologizing to Mr. Lipnik and stating that he knew Mr. Lipnik was subject to strict non-disclosure agreements governing unreleased products.

33. Mr. Ramacciotti kept secret the fact that he had disclosed iOS 19 to Mr. Prosser. Mr. Lipnik found out through others, who claimed to have seen Mr. Lipnik's apartment in a video recording from Mr. Prosser. Only then did Mr. Ramacciotti send an audio message to Mr. Lipnik detailing the compensation proposed by Mr. Prosser and their plan to acquire Apple information. But Mr. Lipnik never reported this improper disclosure or his potential involvement in it to anyone at Apple. Despite the commitments Mr. Lipnik made to protect Apple confidential information, Apple had to learn of the trade secret theft from an anonymous email.

34. Mr. Ramacciotti's actions—including his deliberate attempts to conceal accessing the Development iPhone from Mr. Lipnik and his later apology—demonstrate his understanding that improperly obtaining and sharing information about Apple's unreleased iOS was unlawful

and violated Apple's internal policies and Mr. Lipnik's agreements with Apple.

### D.  Defendants Have Harmed and Pose an Ongoing Threat to Apple

35.  Apple has incurred substantial costs in investigating the Defendants' unauthorized access to its computer and network systems, including the Development iPhone.

36.  Although Apple ended Mr. Lipnik's employment for violation of Apple's policies that protect development and unreleased devices, software, and features, the damage has been done and the risk to Apple persists.  Defendants remain in possession of Apple's trade secrets relating to its confidential software designs, including one or more video recordings.  As Defendants have already shown at least a portion of the recording(s) to others, there is a substantial risk that they will continue to improperly access and disclose them to others.  Moreover, given the extensive access Mr. Lipnik had to sensitive Apple information at the time Defendants broke into the Development iPhone, Mr. Lipnik's failure to report this and multiple prior breaches to Apple, and the brazen nature of Defendants' theft, Apple does not know whether Defendants may have additional recordings or other forms of Apple confidential information that are at risk of disclosure.  While certain features have been disclosed to others in the interim, the Development iPhone additionally contained other unannounced design elements that remain confidential.

### FIRST CLAIM FOR RELIEF

**(Misappropriation of Trade Secrets, Defend Trade Secrets Act, 18 USC § 1832(a)(1))**

37.  Apple realleges and restates the paragraphs above.

38.  The DTSA defines a trade secret as "financial, business, scientific, technical, economic, or engineering information" that "(A) the owner thereof has taken reasonable measures to keep . . . secret" and "(B) . . . derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).

39.  Under the DTSA, "misappropriation" includes "[a]cquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper

means." 18 U.S.C. § 1839(5). Misappropriation further includes the "disclosure or use of a trade secret of another without express or implied consent by a person who (i) used improper means to acquire knowledge of the trade secret; (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5).

40. Defendants acquired and then disclosed Apple confidential and proprietary information constituting trade secrets under 18 U.S.C. § 1839(3) as described in more detail above. Apple has used these trade secrets or intended that they be used in interstate or foreign commerce.

41. Defendants have acted individually and conspired with one another to violate the DTSA by acquiring and disclosing Apple trade secrets despite knowing or having reason to know that they should not have accessed or disclosed them. The trade secrets at issue here include the confidential, unreleased Apple software designs that Mr. Ramacciotti improperly accessed on Mr. Lipnik's Development iPhone at Mr. Prosser's direction and shared with Mr. Prosser. The trade secrets include details of the then-unreleased iOS 19 operating system, including details of the design and functionality of the new iOS's camera, photos, and messaging apps, as well as the planned user interface and user experience. Defendants each knew they should not have accessed Mr. Lipnik's Development iPhone or the trade secrets on that device but did so anyway.

42. The information that Defendants improperly acquired derives independent economic value from not being generally known and not being readily ascertainable by proper means. These trade secrets also are the product of research and development at substantial cost to Apple. At any given time, a Development iPhone might contain a version of unreleased software that may or may not be pursued, or that may be released in a different form. Even if specific unreleased designs ultimately are not used by Apple, their details derive independent value in demonstrating to competitors what Apple has tried and chosen not to implement.

43. Apple has undertaken efforts that are reasonable under the circumstances to maintain the secrecy of the trade secrets at issue. As noted above, these efforts include: passwords and encryption to protect data on its computers, servers, and repositories; the limited distribution of confidential information only to key Apple employees and executives and on a need-to-know basis; written policies and procedures that emphasize employees' duties to maintain the secrecy of Apple's confidential information; and confidentiality and non-disclosure agreements requiring employees, vendors, customers, partners, and contractors to maintain the secrecy of Apple's confidential information.

44. As a direct and proximate result of Defendants' conduct, Apple has suffered and continues to suffer monetary and non-monetary injury and harm in an amount to be proven at trial. These include Apple's lost profits from the unauthorized disclosure of its trade secret information, its investigation costs, its attorneys' fees, and other costs and expenses.

45. Defendants have been unjustly enriched by improperly obtaining and sharing Apple's trade secret information.

46. Defendants' conduct has been willful and malicious, justifying an award of punitive damages.

47. Apple faces irreparable harm from Defendants' past and potential future misappropriation of Apple's trade secrets. Absent injunctive relief from this Court, Defendants' improper acquisition and potential future disclosures of unlawfully acquired Apple trade secrets also threaten Apple with the loss of its competitive advantage, trade secrets, customers, and technological goodwill in amounts for which it would be difficult or impossible to calculate.

### SECOND CLAIM FOR RELIEF

**(Violation of CFAA under 18 U.S.C. § 1030)**

48. Apple realleges and restates the paragraphs above.

49. Mr. Lipnik's Development iPhone is a protected computer within the meaning of 18 U.S.C. § 1030(e)(2).

50. Defendants have acted individually and conspired with one another to violate the CFAA, 18 U.S.C. § 1030(a)(2)(C) and 1030(b) as described in more detail above. Defendants

intentionally accessed a protected computer—Apple's Development iPhone—without authorization from Apple, by logging on using the credentials of Mr. Lipnik and copying confidential files only accessible behind the restricted login.

51. Due to Defendants' conduct, Apple has suffered damage and loss in an amount to be proven at trial but, in any event, exceeding $5,000 aggregated over a one-year period under 18 U.S.C. § 1030(a)(4). Among other things, Apple has been forced to spend a substantial amount of money that is well in excess of $5,000 to investigate and respond to Defendants' conduct.

52. Defendants' unlawful access to and theft of confidential information from the Development iPhone has caused Apple irreparable injury. Unless restrained and enjoined, Defendants will continue to harm Apple. Remedies at law are inadequate to fully compensate Plaintiff for these injuries, entitling Plaintiff to injunctive relief under 18 U.S.C. § 1030(g).

**PRAYER FOR RELIEF**

NOW, THEREFORE, Plaintiff Apple prays for judgment and relief against Defendant as follows:

    a. Judgment in Apple's favor and against Defendants on all causes of action alleged herein;

    b. Injunctive relief as the Court finds necessary and appropriate;

    c. Damages in an amount to be proven at trial;

    d. Punitive damages based on Defendants' willful and malicious misappropriation of trade secrets;

    e. An order directing Defendants not to make use of or disclose Apple's confidential, proprietary, and trade secret information to third parties without its written consent; and to return or assist Apple in locating and destroying any such information in their possession, custody, or control;

    f. Pre-judgment and post-judgment interest at the maximum legal rate as applicable, as an element of damages that Apple has suffered as a result of Defendants' wrongful and unlawful acts;

    g. Reasonable attorneys' fees and costs incurred; and

h. Such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Apple demands a trial by jury for all causes of action, claims, or issues in this action that are triable as a matter of right to a jury.

Dated: July 17, 2025　　　　　　　　　　　　　MORRISON & FOERSTER LLP

By: */s/ Richard S.J. Hung*
　　　Richard S.J. Hung

*Attorneys for Plaintiff*
APPLE INC.

COMPLAINT
CASE NO.　　　　　　　　　　　　　　　　　　　　　　　　　13